UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SERGIO FRANCO,

                                        Plaintiff,

          - against -

ANDREW SAUL,[1] COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.

---

16CV5695 (LMS)

DECISION AND ORDER

LISA MARGARET SMITH, U.S.M.J.[2]

Plaintiff Sergio Franco brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

review of the final decision of Defendant Commissioner of Social Security (the

"Commissioner"), which denied his application for Disability Insurance Benefits ("DIB").  ECF

# 1.  Each party has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  ECF ## 18, 21.  For the reasons that follow, Plaintiff's motion (ECF #

18) is DENIED, and the Commissioner's motion (ECF # 21) is GRANTED.

## BACKGROUND

I.      Procedural Background

On September 7, 2011, Plaintiff protectively filed for DIB, alleging December 29, 2009,

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul has been
substituted as Defendant in this action.

[2] The parties have consented to my exercise of jurisdiction over this matter pursuant to 28
U.S.C. § 636(c).  ECF # 13.

as the onset date of his disability.  Administrative Record ("AR"), at 67, 194-200.[3]  Plaintiff

claimed he was disabled due to hypertension and impairments to his shoulders bilaterally and to

his back.  Id. at 221.  After his claim was denied by the Social Security Administration (the

"SSA" or "Agency"), Plaintiff requested a hearing before an administrative law judge ("ALJ"),

id. at 109-10, which was held on June 11, 2012, id. at 58-66.  On June 18, 2012, the ALJ issued

an unfavorable decision, finding that Plaintiff was not disabled within the meaning of the Social

Security Act (the "Act") from the alleged onset date through the date of the decision.  Id. at 74-

89.  Plaintiff subsequently filed a request for review of that decision with the SSA's Appeals

Council, and the Appeals Council remanded Plaintiff's claims to the ALJ on October 23, 2013,

for further review.  Id. at 90-94.

A second hearing was held on July 3, 2014.  Id. at 38-57.  On September 11, 2014, the

ALJ issued another unfavorable decision, again concluding Plaintiff was not disabled within the

meaning of the Act during the relevant period.  Id. at 19-37.  On November 14, 2014, Plaintiff

again filed a request for review of the ALJ's decision with the Appeals Council.  Id. at 16-18.

Plaintiff's request was denied on May 19, 2016.  Id. at 1-8.  This made the ALJ's September 11,

2014, decision the final decision of the Commissioner.  The instant lawsuit, seeking judicial

review of that decision, followed.

II.     **Medical Evidence**

   A.     **Preceding the December 29, 2009, Disability Onset Date**

Plaintiff first presented to Dr. Thomas Scilaris, an orthopedic surgeon, on October 30,

---

[3] Citations to "AR" refer to the certified copy of the administrative record filed by the
Commissioner.  ECF # 14.

2009.  AR at 510.  Plaintiff stated that he was pulling a pole down at work on September 3, 2009, when he felt "excruciating pain" to his left shoulder.  Id.  He complained of experiencing a clicking popping sensation in his left shoulder ever since.  Id.  Plaintiff denied suffering any previous injuries to that shoulder.  Id.  Dr. Scilaris described Plaintiff as an otherwise "healthy individual."  Id.  A physical examination revealed marked crepitus[4] and pain with abduction of the left shoulder at 140 degrees, significant cross arm adduction testing and impingement signs, and weakness on isolation of the supraspinatus[5] tendon.  Id.  X-rays revealed a type II acromion[6] with no clear bone abnormalities.  Id.  Dr. Scilaris diagnosed Plaintiff with left shoulder AC joint[7] injury with ruling out the possibility of a rotator cuff tear.  Id.  His treatment plan involved placing Plaintiff into physical therapy and having Plaintiff continue taking anti-inflammatories.  Id.  Dr. Scilaris stated he was requesting authorization for an MRI of Plaintiff's left shoulder.  Id.  He also noted Plaintiff was continuing to work.  Id.

A few weeks later, on November 16, 2009, Plaintiff returned to Dr. Scilaris complaining

---

[4] Crepitus is a "grinding, grating feeling or a crunchy sound when joints move."  What are the symptoms of osteoarthritis?, WebMD, https://www.webmd.com/osteoarthritis/qa/what-are-the-symptoms-of-osteoarthritis (last visited July 17, 2020).

[5] The supraspinatus is a muscle in the rotator cuff that keeps the upper arm stable and helps lift the arm.  What Is My Rotator Cuff, and Why Does It Hurt?, WebMD, https://www.webmd.com/pain-management/what-is-my-rotator-cuff#1 (last visited July 17, 2020).

[6] The acromion is the uppermost part of the shoulder blade.  What is an acromioclavicular (AC) joint injury?, WebMD, https://www.webmd.com/pain-management/qa/what-is-an-acromioclavicular-ac-joint-injury (last visited July 17, 2020).

[7] The AC (acromioclavicular) joint is where the acromion connects to the collarbone.  What is an acromioclavicular (AC) joint injury?, WebMD, https://www.webmd.com/pain-management/qa/what-is-an-acromioclavicular-ac-joint-injury (last visited July 17, 2020).

of pain in his left shoulder.  Id. at 511.  A physical examination revealed tenderness in the

shoulder with limited mobility.  Id.  On November 25, 2009, Plaintiff presented to Dr. Eugene

Liu, a physiatrist, for an initial consultation regarding his shoulder injury.  Id. at 313-14.[8]  A

physical examination revealed decreased left shoulder range of motion, intact grip strength,

reflexes within normal limits, and positive supraspinatus stress testing on the left.  Id. at 314.  Dr.

Liu recommended that Plaintiff continue physical therapy.  Id.[9]

Plaintiff returned to Dr. Scilaris on December 10, 2009, with complaints of significant

pain in his left shoulder.  Id. at 512.  A physical examination revealed significant tenderness over

the AC joint and limited range of motion with 120 degrees of forward flexion and 80 degrees of

abduction.  Id.  Dr. Scilaris again diagnosed AC joint injury with ruling out the possibility of a

rotator cuff tear and documented his plan for Plaintiff to continue with physical therapy.  Id.  Dr.

Scilaris noted Plaintiff was still working as a maintenance worker but with the limitations of no

lifting or heavy activity with his left upper extremity.  Id.

### B.       After the December 29, 2009, Disability Onset Date

On January 8, 2010, Plaintiff returned to Dr. Liu for a follow-up evaluation, reporting

increased pain in his left shoulder.  Id. at 315.  Plaintiff described the pain as constant and rated

the intensity of the pain as between six and seven out of ten.  Id.  Range of motion in the left

shoulder was limited with internal rotation to about ten degrees and abduction to about seventy

---

[8] There is a duplicate set of medical records from Dr. Liu for Plaintiff's office visits from November 25, 2009, to September 13, 2011.  See AR at 270-93.

[9] Plaintiff reported to Dr. Liu that he had not been taking any medication but had been doing physical therapy.  AR at 313.  Records reflect that Plaintiff went for physical therapy from December 2, 2009, through April 9, 2010, and then again from May 9, 2011, through June 22, 2011.  Id. at 347-69.

degrees.  Id.  Supraspinatus stress testing on the left was positive.  Id.  Dr. Liu advised continued physical therapy.  Id.

On February 12, 2010, Dr. Liu again examined Plaintiff, noting decreased left shoulder range of motion and tenderness to palpation of the clavicular joint.  Id. at 316-17.[10]  Plaintiff experienced pain on abduction and internal rotation.  Id.  Sensory and motor exams were overall intact.  Id.  Dr. Liu noted Plaintiff was doing physical therapy, which significantly helped his pain.  Id.  Plaintiff was instructed to continue physical therapy and begin Mobic[11] for anti-inflammatory purposes.  Id.  Since Plaintiff was unable to obtain Mobic from the pharmacy, at a follow-up visit on March 17, 2010, Dr. Liu prescribed Voltaren[12] gel instead.  Id. at 318.

Plaintiff underwent an MRI of his left shoulder on March 19, 2010.  Id. at 506-07.  The MRI revealed a focal full thickness tear at the distal anterior supraspinatus tendon.  Id.  The supraspinatus was intact.  Id.  It also revealed enthesopathy[13] along the undersurface of the

---

[10] These two pages, AR at 316-17, are almost identical versions of the medical record for this office visit.

[11] Mobic is the brand name for Meloxicam, which is used "to relieve the symptoms of arthritis . . . such as inflammation, swelling, stiffness, and joint pain."  Drugs and Supplements: Meloxicam (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited July 17, 2020).

[12] Voltaren is the brand name for Diclofenac, which is used "to treat pain and other symptoms of arthritis of the joints . . . such as inflammation, swelling, stiffness, and joint pain."  Drugs and Supplements: Diclofenac (Topical Application Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/diclofenac-topical-application-route/description/drg-20063434 (last visited July 17, 2020).

[13] Enthesopathy is an "umbrella term" for conditions that affect the entheses, which are the places where tendons and ligaments connect to bones.  Enthesitis is inflammation of the entheses.  Enthesopathy and Enthesitis, WebMD, https://www.webmd.com/arthritis/psoriatic-arthritis/enthesitis-enthesopathy#1 (last visited July 17, 2020).

acromion with inflammatory change at the AC joint and a small Bankart lesion.[14]  Id.  Dr. Scilaris incorporated the MRI results into his notes for Plaintiff's visit on April 12, 2010.  Id. at 513.  The notes included Dr. Scilaris' plan to request authorization for left shoulder arthroscopy for rotator cuff repair and a possible subacromial decompression.  Id.  Dr. Scilaris also recommended continued physical therapy, medication as prescribed by Dr. Liu, and activity modification.  Id.

On April 14, 2010, Plaintiff returned to Dr. Liu with complaints of increased pain in his left shoulder and lower back.  Id. at 319.  Plaintiff noted being unable to sleep on his back.  Id. He also could not sit or stand for prolonged periods.  Id.  A physical examination revealed the continuance of previously documented left shoulder symptoms, such as tenderness to palpation, inhibited range of motion, and positive supraspinatus testing on the left.  Id.  Internal rotation was to about ten degrees and abduction was to about seventy degrees.  Id.

During his next visit to Dr. Liu on May 21, 2010, Plaintiff again reported left shoulder pain.  Id. at 320.  Plaintiff said the pain increased when he did not have physical therapy.  Id. The back pain, which was almost constant in nature, had become worse with radiating symptoms down his right leg.  Id.  A physical examination revealed stiff range of motion of the lumbar spine in all directions, tenderness to palpation in the AC joint[15] and paravertebral muscles,

---

[14] A Bankart lesion is when the ligaments are torn from the front of the shoulder socket. Bankart Repair for Unstable Dislocating Shoulders, University of Washington Orthopaedics and Sports Medicine, http://www.orthop.washington.edu/patient-care/articles/shoulder/bankart-repair-for-unstable-dislocating-shoulders.html (last visited July 17, 2020).

[15] Dr. Scilaris corroborated Dr. Liu's finding of tenderness in the AC joint and also noted swelling in the AC joint as well as tenderness and swelling in the anterior acromion on May 27, 2010.  AR at 514.

positive straight leg raise on the right, and severe restriction with abduction and internal rotation of the left shoulder.  Id.  Dr. Liu noted Plaintiff had no gait disturbance and intact lower extremity sensation.  Id.  At a visit to Dr. Liu on June 23, 2010, Plaintiff reported that his left shoulder pain remained the same but that his right-sided lower back pain had increased and made his legs very tired.  Id. at 321.  The physical examination revealed minimal tenderness to palpation of the left shoulder, intact grip strength, and range of motion inhibited by pain.  Id. Plaintiff was to continue with his medication.  Id.

During his visit to Dr. Liu on July 21, 2010, Plaintiff complained of a cracking sensation in his left shoulder, constant pain radiating down to the left elbow, lower back stiffness on the right side, and right hip pain.  Id. at 322.  The physical examination revealed tenderness to palpation of the left shoulder, decreased range of motion with abduction and flexion, positive straight arm test, and positive straight leg test on the right.  Id.  Dr. Scilaris' physical examination, conducted the next day on July 22, 2010, revealed marked pain and weakness on isolation of the supraspinatus tendon with marked impingement signs as well as AC joint tenderness.  Id. at 515.  Dr. Scilaris recorded 145 degrees of forward flexion and 90 degrees of abduction.  Id.  The diagnosis was full thickness rotator cuff tear with left shoulder impingement. Id.  Dr. Scilaris noted Plaintiff had stopped physical therapy even though Dr. Scilaris believed Plaintiff required it.  Id.

Dr. Scilaris received authorization for surgery by the time Plaintiff returned on August 23, 2010.  Id. at 516.  In the physical examination, Dr. Scilaris found marked weakness on isolation of the supraspinatus tendon.  Id.  Left shoulder muscle strength was measured at 4+/5. Id.  Dr. Scilaris' diagnosis was the same one he made after examining Plaintiff the previous

month:  full thickness rotator cuff tear with left shoulder impingement.  Id. at 515-16.  Two days

later, on August 25, 2010, Plaintiff visited Dr. Liu, who described Plaintiff's pain as "status quo."

Id. at 323.  Dr. Liu noted the continuance of earlier symptoms, such as tightness, stiffness, and a

cracking sensation with pain radiating down from the left shoulder.  Id.  Findings from the

physical examination consisted of left shoulder tenderness to palpation, decreased range of

motion on abduction and external rotation, and muscle atrophy.  Id.

On October 6, 2010, Plaintiff returned to visit Dr. Liu and reported left shoulder pain that

was "status quo."  Id. at 324.  Dr. Liu stated Plaintiff's shoulder surgery was canceled because of

lower back pain exacerbation.  Id.  The pain was radiating from his mid-thoracic area to the right

aspect of his lumbar spine and the superior aspect of his pelvic area on the right side.  Id.  The

physical examination revealed left shoulder tenderness to palpation, positive supraspinatus stress

testing, gross atrophy, and limited range of motion in all directions.  Id.  In the lumbar paraspinal

region, Plaintiff's muscles were tender to palpation, and a muscle spasm was detected.  Id.  Dr.

Liu noted decreased range of motion on extension and flexion, positive straight leg raise on the

right in the seated position, and no gait disturbance.  Id.  Plaintiff was able to heel, toe, and

tandem walk.  Id.

Plaintiff returned for a follow-up evaluation with Dr. Liu on November 8, 2010, and he

complained of severe back pain radiating from the mid-thoracic area to the right axial area,

groin, hip, and upper leg.  Id. at 325.  The pain was causing Plaintiff to experience intermittent

numbness and tingling.  Id.  He also complained of muscle spasms in the right axial area and

constant stiffness in the lumbar spine.  Id.  Examination findings regarding the left shoulder

included positive supraspinatus stress testing, tenderness to palpation along the rotator cuff area,

gross muscle atrophy, decreased range of motion in all directions, and decreased strength in the left upper extremity, but the sensory exam was intact.  Id.  Straight leg raise was positive on the right in the seated position.  Id.  Lumbar paravertebral muscles were tender to palpation, and a muscle spasm was observed in the right axial area.  Id.  Plaintiff was able to heel and toe walk properly.  Id.  Dr. Liu noted decreased range of motion on flexion and raising to extension.  Id.  Subsequent examinations on December 9, 2010, January 11, 2011, and February 8, 2011, corroborated many of these findings.  Id. at 327-29.

Dr. Lester Lieberman, an orthopedic surgeon, conducted an independent medical evaluation of Plaintiff on March 8, 2011.  Id. at 304-07.  The evaluation revealed Plaintiff was able to walk regularly, heel walk, toe walk, and stand on one leg.  Id. at 305.  In the lumbar spine, there was no undue depression or elevation, but Plaintiff was tender in the lumbar region. Id.  Flexion in the lower back was to sixty degrees, and extension was to thirty degrees.  Id. at 306.  Bending and rotation were to forty-five degrees bilaterally.  Id.  Sensation and pulsation of the lower extremities were intact and equal bilaterally.  Id.  Plaintiff's reflexes were normal.  Id. On both sides, straight leg raise was positive to seventy degrees while lying down and negative while sitting.  Id.  Plaintiff was able to abduct and flex both shoulders 180 degrees, albeit with pain on abduction at the extremes.  Id.  Dr. Lieberman observed no tenderness on abduction or flexion.  Id.  Dr. Lieberman noted negative impingement, SLAP,[16] subscapularis,[17] Neer, and

---

[16] SLAP stands for superior labrum anterior and posterior, and a labrum SLAP tear is when the labrum—the band of soft tissue surrounding the shoulder socket—is torn at the top in both the front and back of where it connects to the biceps tendon.  What Is a Labrum SLAP Tear?, WebMD, https://www.webmd.com/pain-management/labrum-slap-tear (last visited July 21, 2020).

[17] The subscapularis is the rotator cuff muscle that runs from the shoulder blade to the

Hawkins[18] signs.  Id.  Dr. Lieberman diagnosed Plaintiff with impingement syndrome of both

shoulders and lumbar sprain.  Id.  In Dr. Lieberman's opinion, Plaintiff could return to work at

light duty with restrictions of not lifting, pushing, pulling, or straining more than twenty pounds.

Id.  Dr. Lieberman opined home exercises were needed, but physical therapy was not necessary.

Id.  He noted that although Plaintiff stated that he had pain in his lumbar spine and both

shoulders, Dr. Lieberman's findings on examination were "minimal."  Id.  Dr. Lieberman

concluded by stating Plaintiff's prognosis "appears to be good."  Id.

Upon returning to Dr. Liu on March 15, 2011, Plaintiff reported more complaints about

back pain with vague radiating symptoms.  Id. at 330.  On examination, Dr. Liu noted a muscle

spasm in the paraspinal and left shoulder area.  Id.  Plaintiff experienced pain during

supraspinatus stress testing.  Id.

Plaintiff returned to Dr. Liu on April 12, 2011, and complained of continued pain in both

shoulders and worsening pain in his lower back radiating from his hip to his foot.  Id. at 331.  Dr.

Liu noted Plaintiff had not received physical therapy in about a year, which was "really affecting

his symptoms."  Id.  A physical examination revealed left shoulder tenderness to palpation.  Id.

---

upper arm bone.  A subscapularis tear most commonly causes shoulder pain, especially in the
front of the shoulder, and can also cause symptoms similar to symptoms of other rotator cuff
tears.  Subscapularis Tear, Healthline, https://www.healthline.com/health/subscapularis-tear (last
visited July 21, 2020).

[18] The Neer and Hawkins (or Hawkins-Kennedy) tests are used to assess the location of a
shoulder impingement.  Shoulder Impingement Test:  Important Tool for Evaluating Your
Shoulder Pain, Heathline, https://www.healthline.com/health/sprains-and-strains/shoulder-
impingement-test (last visited July 21, 2020).  A positive Neer sign indicates a subacromial
impingement, and a positive Hawkins test indicates a supraspinatus tendon impingement.  The
Painful Shoulder:  Part I. Clinical Evaluation, American Family Physician,
https://www.aafp.org/afp/2000/0515/p3079.html (last visited July 21, 2020).

Left shoulder range of motion was functional.  Id.  Supraspinatus stress testing was positive on

the left.  Id.  Plaintiff's lumbar paravertebral muscles were tender to palpation, and range of

motion was stiff.  Id.  Straight leg raise was positive on the right.  Id.

Dr. Liu's treatment notes from May 10, 2011, describe Plaintiff's left shoulder and lumbar

paraspinal muscles as "minimally tender to palpation."  Id. at 332; duplicated at 335.  Range of

motion was stiff in Plaintiff's left shoulder, and supraspinatus stress testing was positive.  Id.  In

the lumbar paraspinal area, range of motion was restricted in all directions.  Id.  Sensory and

motor exams were intact.  Id.  Dr. Liu noted that Plaintiff was starting physical therapy.  Id.

Plaintiff's physical examinations in June, August, and September, 2011, revealed largely

the same results as Dr. Liu's examinations from earlier that year.  Id. at 333-34, 336.  The

examination on June 9, 2011, revealed, inter alia, positive straight leg raise bilaterally.  Id. at

333.  On August 11, 2011, Dr. Liu noted Plaintiff experienced the most severe pain in his right

shoulder along the AC joint.  Id. at 334.  Dr. Liu described Plaintiff's range of motion in his

lumbar spine as less than fifty percent of the normal range on September 13, 2011.  Id. at 336.

On September 20, 2011, Dr. Lieberman examined Plaintiff for a second time.  Id. at 301-

03.  After noting an absence of atrophy in both shoulders, Dr. Lieberman documented Plaintiff's

ability to abduct both shoulders to 120 degrees, flex to 140 degrees, and externally rotate to 50

degrees.  Id. at 303.  There was clicking in both shoulders on extremes of motion.  Id.  In

Plaintiff's upper extremities, sensation and pulsation were intact and equal bilaterally.  Id.  Dr.

Lieberman noted muscle strength was good.  Id.  Plaintiff had negative impingement, SLAP,

subscapularis, and Hawkins signs.  Id.  Dr. Lieberman diagnosed Plaintiff with bilateral

impingement syndrome in both shoulders.  Id.  Dr. Lieberman opined that Plaintiff did not need

physical therapy and could perform home exercises.  Id.  He noted that Plaintiff's degree of disability was mild and that Plaintiff could return to work at light duty with restrictions of not lifting, pushing, pulling, or straining more than twenty pounds.  Id.

When Dr. Liu saw Plaintiff on October 18, 2011, he noted Plaintiff was unable to raise his left arm.  Id. at 337.  Plaintiff reported back pain radiating down into his legs with a lot of numbness and tingling.  Id.  He had not been in physical therapy since July of that year.  Id.  Plaintiff stated he was hardly sleeping and did not get out of bed on some days.  Id.  Dr. Liu's examination revealed a limping gait, tender lumbar paraspinal muscles, a muscle spasm, and left shoulder range of motion that was less than fifty percent of the normal range.  Id.

On November 29, 2011, Plaintiff complained of continued pain radiating from his lower back to his legs.  Id. at 338.  Plaintiff was experiencing numbness and a tingling sensation in both legs, particularly on the top of his right foot.  Id.  Plaintiff still had not received physical therapy treatment in "quite some time," which was affecting his ability to function, walk, stand, and move around.  Id.  Dr. Liu's physical examination revealed Plaintiff's lumbar paraspinal muscles were extremely tender to palpation.  Id.  Range of motion was stiff and restricted in all directions.  Id.  Straight leg raise was positive bilaterally.  Id.  Light touch sensation was dull in both lower extremities in the L4 distribution.  Id.  Plaintiff was unable to heel or toe walk due to pain.  Id.  Regarding Plaintiff's left shoulder, the examination revealed minimal tenderness, decreased range of motion, and positive supraspinatus stress testing.  Id.

When Plaintiff visited Dr. Liu on January 31, 2012, he complained of continued pain radiating from his lower back to his legs.  Id. at 339.  The pain in his right leg was worse than it was in his left.  Id.  Dr. Liu stated Plaintiff was experiencing "quite a bit of pain" because "he has

not been in physical therapy for quite some time." Id.  Despite the pain, Dr. Liu noted Plaintiff had been looking for jobs that required limited lifting, pushing, and pulling.  Id.  The physical examination showed lumbar paraspinal muscles tender to palpation, a muscle spasm, restricted lumbar spine range of motion, dull light touch sensation in the right lower extremity in the L4 pattern, positive straight leg raise on the right, minimal tenderness in the left shoulder, and decreased range of motion of the left shoulder.  Id.  Dr. Liu suggested Plaintiff needed physical therapy to "possibly get him back to the level where he is able to return to work."  Id.

On February 28, 2012, Plaintiff reported experiencing severe pain and numbness down his right leg and foot whenever he walked longer than a short distance.  Id. at 340.  After examining Plaintiff, Dr. Liu documented Plaintiff's left shoulder tenderness to palpation and restricted range of motion.  Id.  Sensory and motor exams were intact.  Id.  Dr. Liu described Plaintiff's lumbar paraspinal muscles as "minimally tender" with stiff and restricted range of motion.  Id.  Additional findings included positive straight leg raise on the left and dull light touch sensation on the left in the L4 pattern.  Id.  Dr. Liu noted that Plaintiff needed "structured physical therapy" to improve his endurance, strength, and range of motion.  Id.

Dr. Liu's next physical examination of Plaintiff took place on March 29, 2012, and showed decreased range of motion of the left shoulder.  Id. at 341.  Supraspinatus stress testing was painful on the left.  Id.  There was some point tenderness along Plaintiff's right shoulder.  Id.  In the lumbar paraspinal area, range of motion was stiff, and a muscle spasm was present.  Id.  Straight leg raise was measured to about forty degrees from the seated position.  Id.  Dr. Liu noted the absence of gross muscle atrophy.  Id.  Tendon reflexes were trace and symmetrical.  Id.

13

An MRI of Plaintiff's lumbar spine conducted on April 10, 2012, showed disc bulges at the L1-2 and L4-5 levels, straightening of the lumbar spine (possibly due to muscle spasm), no significant spinal stenosis,[19] moderate neural foraminal narrowing[20] by the encroaching disc at the L4-5 level, and mild facet hypertrophy[21] throughout.  Id. at 310; duplicated at 508.  On April 24, 2012, Dr. Liu noted the MRI results corresponded to Plaintiff's upper lumbar pain and occasional radiating pain down his right leg.  Id. at 342.  The physical examination revealed tender lumbar paraspinal muscles, stiff and restricted range of motion, intact sensory and motor exams, negative straight leg raise, and tender shoulder joint lines bilaterally with decreased range of motion.  Id.

On May 15, 2012, Dr. Liu completed a residual functional capacity assessment, id. at 343-45, in which he diagnosed Plaintiff with lumbar disc herniation, radiculopathy,[22] and

---

[19] Spinal stenosis is a narrowing of the spaces within the spine, which can put pressure on the nerves travelling through the spine.  Spinal stenosis, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961?_ga=2.105072395.900712207.1532027368-595990397.1532027368 (last visited July 17, 2020).

[20] Neural foraminal narrowing (or neural foraminal stenosis) is a type of spinal stenosis in which the small openings between the bones in the spine—the neural foramina—constrict. Neural Foraminal Stenosis, Healthline, https://www.healthline.com/health/neural-foraminal-stenosis#:~:text=Overview,neural%20foramina%2C%20narrow%20or%20tighten (last visited July 17, 2020).

[21] Facet hypertrophy is the degeneration and enlargement of the facet joints—a pair of small joints at each level along the back of the spine that offer support, stability, and flexibility to the spine.  Hypertrophic Facet Disease Definition, Spine-Health, https://www.spine-health.com/glossary/hypertrophic-facet-disease (last visited July 17, 2020).

[22] Radiculopathy is a medical term used to describe the symptoms, which often include pain, weakness, numbness, and tingling, resulting from the pinching of a nerve root in the spinal column."  Radiculopathy, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited July

shoulder impingement/compensatory injury, id. at 344.  He indicated Plaintiff was occasionally capable of lifting up to ten pounds but never capable of lifting more.  Id.  Dr. Liu noted that in an eight-hour work day Plaintiff could stand and/or walk for up to one hour (but only five minutes without interruption) and sit for up to two hours (but only ten to fifteen minutes without interruption).  Id.  According to Dr. Liu, Plaintiff was never able to climb, bend, stoop, crouch, kneel, or crawl.[23]  Id. at 345.  Plaintiff was more capable of performing the listed manipulative activities, for he could occasionally reach, push, and pull, and he could frequently feel and handle.  Id.  Dr. Liu checked every box on the form as representing an environmental limitation affecting Plaintiff.[24]  Id.  Dr. Liu opined that all of the foregoing limitations had been present since November 25, 2009.  Id.

Plaintiff returned to Dr. Liu on May 24, 2012, for an evaluation of his left shoulder and lower back pain.  Id. at 462.  Dr. Liu noted Plaintiff's disinclination for an epidural injection because of his fear of needles.  Id.  Dr. Liu stated physical therapy had benefitted Plaintiff in the past, but it had not been renewed.  Id.  Additionally, Dr. Liu noted Plaintiff's pain in the L4 distribution corresponded to the results of an MRI conducted the previous month.  Id.  The physical examination revealed diminished range of motion of the lumbar region with flexion to fifty degrees and lateral flexion to ten degrees bilaterally.  Id. at 462-63.  Lower extremity

---

17, 2020).

[23] Balancing was the only listed postural activity that Plaintiff could occasionally perform.  AR at 345.

[24] The list of environmental limitations consisted of heights, chemicals, fumes, moving machinery, dust, humidity, temperature extremes, noise, and vibration.  AR at 345.

strength was full on both sides in every group.  Id. at 462, 464.  Sensation and reflexes were both

2+ bilaterally.  Id. at 462.  Left shoulder range of motion was diminished with pain on internal

and external rotation.  Id.  There was no tenderness to palpation over the anterior aspect of the

glenohumeral joint[25] in the shoulder.  Id.

On June 1, 2012, Plaintiff first presented to Dr. Hemant Patel, an internist, with

complaints of hypertension and chronic back pain in the lumbar region.  Id. at 418.  Dr. Patel

noted the back symptoms did not include decreased range of motion.  Id.  According to Dr.

Patel's notes, Plaintiff described his back symptoms as "mild."  Id.  Dr. Patel examined Plaintiff

on June 1, June 14, and June 28, and each examination revealed full range of motion in all major

joints.  Id. at 414-21.  Dr. Liu also examined Plaintiff on June 28, 2012, and he described

Plaintiff's left shoulder as non-tender.  Id. at 465.  Dr. Liu's physical examination revealed

slightly decreased left shoulder range of motion on internal rotation, minimally tender lumbar

paraspinal muscles, and restricted range of motion in the lumbar area.  Id. at 465-66.  Muscle

strength was full throughout.  Id. at 467.

Plaintiff returned to Dr. Liu on July 24, 2012, complaining of struggling to exercise

because of the accompanying pain in his lower back and left shoulder.  Id. at 468.  Walking

caused his left leg to swell and his toes to cramp.  Id.  According to Dr. Liu, Plaintiff had not

been in structured physical therapy "in a while" and had been getting many more muscle spasms.

Id.  Plaintiff's left shoulder had become more sensitive to weather changes.  Id.  The physical

examination revealed tenderness along the rotator cuff of the left shoulder with restricted range

---

[25] The glenohumeral joint is the joint in the shoulder complex that connects the upper extremity to the trunk.  Glenohumeral Joint, Physiopedia, https://www.physio-pedia.com/Glenohumeral_Joint (last visited July 17, 2020).

of motion, particularly on internal rotation.  Id.  Plaintiff's lumbar paraspinal muscles were also

tender with restricted range of motion.  Id.  Range of motion was full for Plaintiff's cervical

region, right shoulder, elbows, wrists, hips, knees, and ankles.  Id. at 469.  Muscle strength was

full throughout.  Id. at 470.

On September 27, 2012, Plaintiff returned to Dr. Patel for a follow-up evaluation

regarding his hypertension.  Id. at 423-24.  Dr. Patel noted Plaintiff's hypertension was stable

with medication.  Id. at 424.  As for musculoskeletal issues, Plaintiff was experiencing joint pain,

but he had full range of motion in every major joint.  Id. at 423-24.  According to Dr. Patel's

notes, Plaintiff was not experiencing back pain.  Id. at 423.

On October 2, 2012, Dr. Liu examined Plaintiff, who complained of increased back pain

and left shoulder pain, with pain radiating down his left leg and constant cramping in his left

toes.  Id. at 471.  Findings from the physical examination included tender lumbar paraspinal

muscles, restricted range of motion on extension, positive straight leg raise on the left, dull light

touch sensation in the left lower extremity, trace and symmetric tendon reflexes at the ankles,

and minimal tenderness in the left shoulder with decreased range of motion.  Id.  On October 18,

2012, Dr. Patel characterized Plaintiff's back pain as stable with no radiation and hypertension as

stable with medication.  Id. at 425-26.  Plaintiff's back pain remained stable in his next visit to

Dr. Patel on November 8, 2012, but his hypertension was elevated.  Id. at 427-28.  Dr. Patel also

noted that joint pain was not present.  Id. at 427.

Plaintiff visited Dr. Liu on December 11, 2012, with complaints of pain radiating from

his back down his left leg, cramping in his left leg, and tightness in his left shoulder and right

trapezius.  Id. at 474.  The physical examination revealed minimal tenderness and decreased left

shoulder range of motion.  Id. at 474-75.  Supraspinatus stress testing caused discomfort on the left side.  Id. at 474.  Plaintiff's lumbar paraspinal muscles were also minimally tender with restricted range of motion.  Id. at 474-75.  A mild spasm was observed in the bilateral paraspinal muscles.  Id. at 474.  In the left lower extremity, straight leg raise was positive, and light touch sensation was dull.  Id.  Muscle strength was full in the lower extremities and tendon reflexes were 2+ bilaterally.  Id. at 474, 476.  On December 16, 2012, Dr. Patel again documented full range of motion in all major joints and an absence of joint pain.  Id. at 429-30.

On February 7, 2013, Dr. Liu observed Plaintiff was hunched over when he walked.  Id. at 477.  Dr. Liu's physical examination revealed minimally tender lumbar paraspinal muscles and a mild spasm.  Id.  Plaintiff had full range of motion in his cervical region, shoulders, elbows, wrists, hips, knees, and ankles on both sides.  Id. at 478.  Lumbar spine range of motion was restricted:  flexion-extension was to sixty degrees and lateral flexion was to twenty degrees bilaterally.  Id. at 477-78.  Manual muscle testing revealed full strength throughout.  Id. at 479.

On March 21, 2013, Plaintiff reported radiating pain down both arms (but more so on the left side) to Dr. Liu.  Id. at 480.  Plaintiff said he needed a letter for Social Services that stated he was temporarily disabled and unable to work.  Id.  Dr. Liu's examination again revealed minimally tender lumbar paraspinal muscles and restricted range of motion of the lumbar spine.  Id.  No spasms were detected.  Id.  Left shoulder range of motion was severely restricted, as forward elevation was to 120 degrees, abduction to 120 degrees, adduction to 20 degrees, and internal rotation to 25 degrees.  Id. at 480-81.  The right shoulder was hiked and uneven when compared to the left shoulder.  Id. at 480.  Dr. Liu observed mild atrophy in Plaintiff's trapezius

muscles on the left side.  Id.  Manual muscle testing again revealed full strength throughout.  Id.
at 482.

Plaintiff's next examination with Dr. Liu on April 9, 2013, showed "pretty much no
change from the previous visit."  Id. at 483.  There were no diffuse muscle spasm and no trigger
points in the cervical and lumbar areas.  Id.  The neck and back had full range of motion.  Id.
There was some limitation, however, in left upper extremity range of motion.  Id.  Range of
motion was otherwise full throughout.  Id. at 484.[26]  Muscle strength was also full throughout.
Id. at 485.  Upper and lower extremity strength, sensation, and deep tendon reflexes were intact.
Id. at 483.  On April 26, 2013, Dr. Patel noted back pain was present but joint pain was not.  Id.
at 437.  Plaintiff had full range of motion in all major joints.  Id. at 438.  As for Plaintiff's
hypertension, Dr. Patel stated it was stable with medication.  Id.  An annual depression screening
indicated Plaintiff had been suffering from mild depression.  Id.

Dr. Liu examined Plaintiff on May 14, 2013, but Plaintiff's status on that date is unclear
in light of the discrepancy between Dr. Liu's written report and the accompanying range of
motion table included in the medical records.[27]  Id. at 486-87.  On May 31, 2013, Dr. Patel noted
Plaintiff had back pain and joint pain in his shoulder.  Id. at 439.  The physical exam revealed

---

[26] Although Dr. Liu's notes state that there was "some limitation of the range of motion of
the left upper extremity," AR at 483, the table with the range of motion testing results does not
indicate any limitations on Plaintiff's range of motion in any part of his body.  Id. at 484.

[27] For example, Dr. Liu wrote range of motion in the cervical area was to thirty degrees
throughout, but the table indicates that it was to a full forty-five degrees throughout.  AR at 486-
87.  Likewise, Dr. Liu wrote flexion was to forty-five degrees with lateral flexion to fifteen
degrees bilaterally in the lumbar area, but the table shows flexion to a full ninety degrees and
lateral flexion to a full thirty degrees bilaterally in the lumbar area.  Id.

full range of motion in all major joints.  Id. at 439-40.  Plaintiff's hypertension was stable.  Id. at

440.  Dr. Patel also noted Plaintiff's posture and gait were both normal.  Id. at 441.

In his treatment notes dated June 4, 2013, Dr. Liu began by mentioning Plaintiff's left

shoulder, neck, and back pain.  Id. at 489.  Several sentences later, however, Dr. Liu stated

Plaintiff "has no complain[t]s regarding his neck."  Id.  Dr. Liu noted Plaintiff had not received

physical therapy since May, 2011.  Id.  The physical examination revealed familiar findings:

tender lumbar paraspinal muscles on palpation, restricted range of motion, positive straight leg

raise on the left lower extremity, decreased light touch sensation in the left lower extremity,

minimally tender left shoulder on palpation with restricted range of motion, and intact sensory in

the upper extremity.  Id.  Dr. Liu noted Plaintiff's "improved symptoms" and planned for Plaintiff

to "continue all conservative treatment at this point."  Id.

Also on June 4, 2013, Dr. Liu completed another residual functional capacity form, in

which he stated Plaintiff's pain and symptoms were sufficiently severe to frequently interfere

with his attention and concentration.  Id. at 370.  The form indicated Plaintiff could sit and stand

for a maximum of five minutes at a time.  Id.  Plaintiff could sit and stand/walk for less than two

hours in an eight-hour work day.  Id.  Furthermore, Plaintiff needed to be able to shift positions

at will from sitting, standing, or walking.  Id.  Plaintiff could lift up to ten pounds occasionally,

but never more than that.  Id.  Finally, Dr. Liu noted Plaintiff could occasionally reach, feel,

handle, push, and pull, but he could never bend, stoop, crawl, climb, kneel, or squat.  Id.

On July 9, 2013, Plaintiff returned to Dr. Liu reporting back pain and lower extremity

radicular symptoms.  Id. at 492.  Dr. Liu observed a muscle spasm in Plaintiff's paraspinal area.

Id.  The physical examination further revealed limited range of motion, dull light touch sensation

20

in the lower extremities in the L5 pattern, and trace tendon reflexes.  Id.  Dr. Liu documented the treatment plan of holding off on interventional treatment and continuing with medication and home exercises.  Id.  In summarizing the visit, Dr. Liu stated that in light of Plaintiff's chronic condition, maximum medical improvement had been reached regarding no further intervention. Id.

Plaintiff reported status quo back pain and radiating symptoms when he visited Dr. Liu on August 8, 2013.  Id. at 493.  According to Dr. Liu, Plaintiff resisted a lumbar injection because of his fear of needles and because he was "tolerating the medication" and doing home exercises.  Id.  The examination exposed a muscle spasm in the paraspinal area.  Id.  Straight leg raise was to twenty degrees with discomfort in the right.  Id.  Tendon reflex was trace.  Id. Range of motion testing revealed no limitations in the cervical region or right shoulder.  Id. at 494.  In the left shoulder, range of motion was limited to 130 degrees for forward elevation and abduction, and to 20 degrees for adduction and internal rotation.  Id.  There were no range of motion limitations for Plaintiff's elbows, wrists, hips, knees, or ankles.  Id.  Lumbar flexion-extension was limited to fifty degrees, and lateral flexion was to twenty degrees bilaterally.  Id. Muscle testing revealed full muscle strength throughout.  Id. at 495.

On September 12, 2013, Plaintiff reported continued lower back symptoms and rated his pain level as six out of ten.  Id. at 496.  The physical examination revealed tender lumbar paraspinal muscles on palpation and restricted range of motion:  flexion-extension to sixty degrees and lateral flexion to ten degrees bilaterally.  Id. at 496, 498.  Regarding the left lower extremity, straight leg raise was positive, and there was a decrease in light touch sensation.  Id. at 496.  Left shoulder range of motion was full.  Id. at 498.

On November 5, 2013, Dr. Patel noted Plaintiff's back pain and joint pain, normal posture and gait, and full range of motion in all major joints. Id. at 443-44. According to Dr. Patel, Plaintiff's hypertension and back pain were stable with medication. Id. at 444. Meanwhile, Plaintiff's depression was stable even without medication. Id.

Plaintiff returned to see Dr. Liu on December 3, 2013, complaining of continued back pain radiating down his left leg, cramping, leg spasm, and abdominal pain. Id. at 499. The physical examination revealed minimally tender lumbar paraspinal muscles with restricted range of motion: flexion-extension was to fifty degrees and lateral flexion was to thirty degrees bilaterally. Id. at 499-500. Straight leg raise was positive on the left. Id. at 499. Sensory and motor exams in the lower extremities were intact. Id. Range of motion was full in all areas other than the lumbar region. Id. at 500. Muscle testing continued to reveal full strength throughout. Id. at 501.

On March 6, 2014, Plaintiff returned to Dr. Liu with continued back pain radiating down into his legs. Id. at 502. Plaintiff's symptoms were increased since he had fallen down steps two weeks before the visit. Id. The physical examination revealed tender lumbar paraspinal muscles and restricted range of motion: flexion-extension was to fifty degrees.[28] Id. at 502-03. Range of motion was full in every other region. Id. at 503. Straight leg raise was positive bilaterally. Id. at 502. Muscle strength remained full throughout. Id. at 504.

Plaintiff's last documented visit to Dr. Liu occurred on April 3, 2014. Id. at 505. Plaintiff complained of continuous pain in his lower back that occasionally traveled down through the left lower extremity. Id. The pain was accompanied by numbness, tingling, and

---

[28] Lateral flexion, however, was to a full thirty degrees bilaterally. AR at 503.

spasms in the left foot.  Id.  Additionally, Plaintiff complained of left shoulder pain.  Id.  The physical examination revealed lumbar paraspinal muscles tender to palpation, and the lumbar spine range of motion was restricted to fifty degrees on flexion-extension and ten degrees bilaterally on lateral flexion.  Id.  In a third-degree sitting position, straight leg raise was positive to the left lower extremity with leg flexion to thirty degrees.  Id.  Left shoulder range of motion was restricted.  Id.  In the cervical area, range of motion was to about thirty degrees throughout. Id.  Dr. Liu observed the presence of muscle spasms in both the cervical and lumbar areas.  Id.  Upper and lower extremity strength, sensation, and deep tendon reflexes were intact.  Id.  Straight leg raise was not localizing to the lower extremity.  Id.

### C.    Consultative Examination

Plaintiff presented to Dr. Aurelio Salon for both a consultative internal medicine examination and a consultative neurologic examination on December 19, 2013.  Id. at 388-91, 399-403.  Plaintiff principally complained of bilateral shoulder pain, lower back pain, and hypertension.  Id. at 388, 400.  Dr. Salon noted Plaintiff had physical therapy on his left shoulder for about two to three months in 2010 and not again since then.  Id.  As for Plaintiff's lower back, Dr. Salon stated the pain was non-radiating, and Plaintiff never had physical therapy for that region.  Id.  Plaintiff was diagnosed with hypertension in 2002, but did not exhibit any symptoms at the time of Dr. Salon's examination.  Id.

Plaintiff could capably perform many activities of daily living, such as cooking, cleaning, doing laundry, shopping, and watching television.  Id. at 389, 401.  Plaintiff was able to shower and dress himself.  Id.  According to Dr. Salon, Plaintiff did not appear to be in any acute distress.  Id.  Plaintiff's gait and stance were normal.  Id.  He was capable of walking on his heels

and toes without difficulty, and he did not use an assistive device.  Id.  Plaintiff squatted 1/3 of full, needed no help getting changed for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty.  Id.  Hand and finger dexterity were intact, and grip strength was full bilaterally.  Id. at 390, 402.  Range of motion was normal for the cervical, thoracic, and lumbar spine with no tenderness or muscle spasm.  Id.  Straight leg raise was negative bilaterally.  Id.  Range of motion was full bilaterally in the shoulders, elbows, forearms, wrists, hips, knees, and ankles.  Id. at 402.  In the upper and lower extremities, Dr. Salon noted full muscle strength, equal deep tendon reflexes, and no muscle atrophy.  Id. at 390, 402.  Dr. Salon concluded there were no objective findings showing Plaintiff had a diminished ability to sit, stand, climb, push, pull, or carry heavy objects.  Id. at 390, 403.

Furthermore, on December 23, 2013, Dr. Salon completed a residual functional capacity questionnaire, id. at 404-10, in which he noted that Plaintiff could lift and carry up to 10 pounds continuously, 20 pounds frequently, and 100 pounds occasionally.  Id. at 404.  According to Dr. Salon, Plaintiff could sit, stand, and walk for up to eight hours at one time without interruption and did not require a cane to ambulate.  Id. at 405.  Plaintiff could also continuously handle, finger, and feel, frequently reach (except overhead), and occasionally reach overhead and push/pull with both hands.  Id. at 406.  With respect to postural activities, Plaintiff could frequently climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, and crawl.  Id. at 407.  Plaintiff could frequently tolerate unprotected heights and occasionally tolerate moving mechanical parts, but could continuously tolerate all other environmental limitations.  Id. at 408.  Finally, Plaintiff could go shopping, travel by himself, ambulate without assistive devices, walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, climb a few

steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed

himself, care for his personal hygiene, and sort, handle, or use paper/files.  Id. at 409.

**III.**     **Other Evidence**

   **A.**     **Agency Forms**

   On September 20, 2011, Plaintiff completed a Disability Report, in which he listed

hypertension, bilateral shoulder pain, and back pain as the medical conditions limiting his ability

to work.  Id. at 220-21.  Plaintiff indicated he stopped working as of December 29, 2009, because

of the aforementioned conditions.  Id. at 221.  Plaintiff had worked in one maintenance job for

about seven and one half years before stopping in December, 2009.  Id. at 222.  He identified Dr.

Liu and Dr. Klein[29] as medical sources who had records relevant to his claims.  Id. at 224-25.

   On October 31, 2011, Plaintiff completed a "Function Report-Adult," indicating he was

unable to perform daily living tasks without experiencing pain and discomfort.  Id. at 229-30.

For example, he noted having difficulty dressing, bathing, caring for his hair, and shaving.  Id. at

231.  Plaintiff also stated he was having difficulty falling and staying asleep.  Id. at 230.  Plaintiff

noted that he could prepare simple meals, such as soups, sandwiches, and microwavable meals,

and could do light dusting and cleaning, but he had to take breaks in between chores.  Id. at 231-

32.  He did not feel comfortable driving since the onset of his condition.  Id. at 232.  Plaintiff's

hobbies included reading and watching television on a daily basis, but both required him to take

frequent breaks because he could not remain in one position for a long time.  Id. at 233.  Plaintiff

---

[29] Dr. Klein was not mentioned anywhere else in the administrative record.  It appears that she treated Plaintiff for hypertension, as Plaintiff listed her as the prescriber for the medication Valsartan, which he stated he took to treat his hypertension.  See AR at 224.

stated he could not socialize as he once did.  Id. at 234.  He reported that his ability to lift, stand, walk, sit, climb stairs, kneel, squat, reach, use his hands, see, hear, and talk had all been negatively affected by his injury.  Id.  Plaintiff said he was able to walk for two to three blocks before needing to rest for five minutes.  Id. at 235.  He mentioned his tendency to become easily frustrated increased his symptoms.  Id.

### B.      Hearing Testimony

An administrative hearing was held before ALJ Michael Friedman on June 11, 2012.  Id. at 58-66.  Plaintiff was forty-five years old at the time of the hearing,[30] which he attended with his attorney.  Id. at 58.  Plaintiff testified that he lived by himself in an apartment.  Id. at 60-61. Plaintiff stated he last worked in December, 2009, in a maintenance position, but he had to stop because he injured his left shoulder and back in an accident at work.  Id. at 61.  Plaintiff said he had received physical therapy, but it had not helped his shoulder much.  Id.  Lying down helped alleviate the shoulder pain.  Id. at 62.  He also took medications to help the pain, but their side effects included stomach problems and sleepiness.  Id. at 61, 64.  Plaintiff described being able to stand for a maximum of thirty minutes, sit for thirty to forty-five minutes, and walk for ten to fifteen minutes.  Id. at 62.  Plaintiff stated that he traveled by subway to the hearing.  Id. Although Plaintiff did not need a cane when he walked outside, he nevertheless used one in his home.  Id. at 64.  Included in Plaintiff's regular activities were grocery shopping (although he needed someone to go with him), cooking, cleaning, reading, and watching television.  Id. at 62-63.  Plaintiff stated he could comfortably lift a maximum of ten pounds.  Id. at 63.

---

[30] Plaintiff was born on December 9, 1966.  AR at 67.

26

A second administrative hearing was held before ALJ Michael Friedman on July 3, 2014. Id. at 38-57.  Plaintiff was forty-seven years old at the time of the hearing, which he attended with his non-attorney representative.  Id. at 25, 38, 182-83.  Plaintiff said he continued to live by himself in an apartment.  Id. at 41.  When describing his maintenance position, he stated he "fixed everything" and "had to clean and paint."  Id. at 42.  In addition to the shoulder pain he described in the first hearing, Plaintiff now described experiencing constant pain in his neck and lower back as well.  Id. at 42, 45.  He said that the pain in his shoulders ran down his arms into his hands; that he lost feeling in his hands; that it was hard for him to move his hands; and that he dropped things.  Id. at 47.  Plaintiff testified that his ability to use a computer was hampered by the pain in his hands and neck, and that he could not use a computer for more than ten minutes a day.  Id.  Plaintiff stated that he had problems reaching with his arms both in front and to the sides.  Id. at 48.  When asked to rate the intensity of the pain on a scale of one to ten, he responded "[b]etween seven and eight."  Id. at 46.  Plaintiff continued to take pain medications because they helped "[a] little bit" even though they caused him to "get very dizzy."  Id.  He noted that lying down helped the pain, id. at 43, but he also said that he had trouble sleeping at night because of the pain.  Id. at 48.  Plaintiff was going to physical therapy and doing exercises at home.  Id.  He explained that the physical therapy helped lessen the pain temporarily, but the alleviative effect stopped once the therapy session ended.  Id.  Sitting for a long time caused him to experience a lot of pain.  Id.  Plaintiff said he could sit for twenty-five to thirty minutes, stand for twenty to thirty minutes, walk for twenty minutes (although his feet got swollen), and lift a maximum of five pounds.  Id. at 44.  Plaintiff took the subway alone to the hearing.  Id.  Since the first hearing, Plaintiff had started occasionally using a cane outside of his house.  Id. at 46.

Plaintiff was engaging in the same activities as the ones he described in the prior hearing, but he had since started to experience neck pain when sitting in one position for too long, which hampered his ability to watch television.  Id. at 46-47.  In the interim period between the two administrative hearings, Plaintiff started doing pottery.  Id. at 45.

The ALJ called upon a vocational expert ("VE") to testify telephonically at the second hearing.  Id. at 50.  The ALJ provided the following description to the VE:  "He's Spanish-speaking, a light R[esidual]F[unctional]C[apacity], and here are the restrictions.  The . . . left non-dominant arm is limited to ten pounds lifting, and in addition, the jobs should permit a five-minute break in the morning, and a five-minute break in the afternoon, in addition to the customary morning 15-minute break, afternoon 15-minute break, and 30 minutes for lunch."  Id. at 51.  The VE responded by providing three jobs from the DOT[31] that she described as involving "light, unskilled work":  (1) assembler of small products; (2) cleaner (housekeeping); and (3) machine operator.  Id. at 51, 53.[32]  Upon being questioned by Plaintiff's attorney, the VE stated Plaintiff would be unable to work as a cleaner (housekeeper) if he needed to alternate between sitting and standing.  Id. at 54.

## APPLICABLE LEGAL PRINCIPLES

### I.   Standard of Review

The scope of review in an appeal from a social security disability determination involves

---

[31] "DOT" refers to the United States Department of Labor's Dictionary of Occupational Titles.

[32] The ALJ rejected two of the VE's first three job suggestions (messenger and usher) because of Plaintiff's limited ability to speak and read English.  AR at 51-52.

two levels of inquiry.  First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standards when determining that the plaintiff was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct legal standard is a ground for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984).

Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 106 (internal quotation marks and citations omitted).  When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides."  Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

## II.   Determining Disability

The Act defines the term "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  One is disabled under the Act if he

29

or she suffers from an impairment which is "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  " '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id.

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow in determining whether a particular claimant is disabled.  The Commissioner first considers whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i),(b).  If the claimant is so engaged, then the Commissioner will find that the claimant is not disabled; if the opposite is true, then the Commissioner proceeds to the second step.  Id.  At step two, the Commissioner determines the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant suffers from any severe impairment, the Commissioner, now at step three, must decide if the impairment meets or equals a listed impairment; listed impairments are presumed severe enough to render one disabled, and the criteria for each listing are found in Appendix 1 to Part 404, Subpart P of the Social Security Regulations.  20 C.F.R § 404.1520(a)(4)(iii),(d).

If the claimant's impairments do not satisfy the criteria of a listing at step three, the Commissioner must then determine the claimant's residual functional capacity ("RFC").  20 C.F.R. § 404.1520(e).  A claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations."  20 C.F.R. § 404.1545(a)(1).  Then, the Commissioner proceeds to the fourth

step to determine whether the claimant can perform his or her past relevant work.  20 C.F.R. §

404.1520(a)(4)(iv),(e)-(f).  If the claimant cannot perform his or her past relevant work, the

Commissioner proceeds to step five to consider the claimant's RFC, age, education, and work

experience to determine whether he or she can adjust to other work.  20 C.F.R. §

404.1520(a)(4)(v),(g).

     The claimant bears the burden of proof on the first four steps of this analysis.  <u>DeChirico</u>

<u>v. Callahan</u>, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the ALJ concludes at an early step of the

analysis that the claimant is not disabled, he or she need not proceed with the remaining steps.

<u>Williams v. Apfel</u>, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts

to the Commissioner to show that the claimant is capable of other work.  <u>DeChirico</u>, 134 F.3d at

1180 (citation omitted).

## <u>DISCUSSION</u>

     Presently before the Court are the parties' cross motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  Plaintiff moves for the Court to

reverse the Commissioner's decision and enter judgment in his favor, or remand the matter to the

Agency for further administrative proceedings, ECF # 18.  He advances two main arguments in

support of such relief, asserting that the Commissioner improperly evaluated (1) the medical

opinion evidence, and (2) Plaintiff's allegations of pain.  ECF # 19 at 13-24; ECF # 24 at 2-10.

Defendant, on the other hand, argues that the Commissioner's decision should be affirmed

because it is supported by substantial evidence and based upon the application of correct legal

standards.  ECF # 22 at 18-29.  As discussed below, the Court finds no reason to disturb the final

determination of the Commissioner, and therefore grants Defendant's motion.

I.      **ALJ's Decision**

On September 11, 2014, ALJ Friedman employed the five-step analysis described above and issued a decision finding that Plaintiff was not disabled since the alleged onset date.  AR at 19-37.  As an initial matter, the ALJ determined that Plaintiff met the insured status requirements of the Act through September 30, 2015.  Id. at 27.  At the first step of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 29, 2009.  Id.  At the second step, the ALJ determined that Plaintiff had two severe impairments:  back disorder and left shoulder disorder.  Id.  At the third step, the ALJ determined that neither of Plaintiff's impairments met or medically equaled the severity of a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 27-28.

According to the ALJ, Plaintiff retained the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), albeit with a few limitations.  Id. at 28.[33]  The ALJ found that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently.  Id. at 31.  In addition, the ALJ determined Plaintiff could spend up to six hours standing, walking, and/or sitting during an eight-hour workday.  Id.  However, Plaintiff was limited to lifting ten pounds with his left arm and restricted to jobs permitting an extra five-minute break in the morning and afternoon.[34]  Id. at 28, 31.

---

[33] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

[34] Such jobs must also permit the customary fifteen-minute morning break, fifteen-minute afternoon break, and thirty-minute lunch break.  AR at 28, 31.

The ALJ determined Plaintiff's RFC by applying the multi-step framework described in 20 C.F.R. § 404.1529.  Id. at 28-32.  First, he outlined Plaintiff's medically determinable impairments and concluded they could reasonably be expected to cause the alleged symptoms. Id. at 28.  Second, the ALJ evaluated Plaintiff's statements about his symptoms to make a finding about the credibility of those statements in light of the totality of the record.  Id.  The ALJ considered Plaintiff's statements about, inter alia, the nature of his pain, the effect of various treatment methods, and his daily activities.  Id.  The ALJ then looked to the objective medical evidence in the record before concluding that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were not credible.  Id. at 28-32.  In weighing the medical evidence, the ALJ gave "great weight" to the opinion of independent medical examiner, Dr. Lieberman, because (1) Dr. Lieberman is a specialist in the relevant area, namely, orthopedics; and (2) Dr. Lieberman's opinion was consistent with the overall record.  Id. at 31. The ALJ was "not persuaded" by the opinion of treating physician, Dr. Liu, because it was not supported by the findings from the MRIs and physical examinations or Dr. Liu's own progress notes.  Id.

At the fourth step, the ALJ found that Plaintiff was unable to perform his past relevant work as a janitor/maintenance worker, which was medium in exertion and unskilled.  Id. at 32. The ALJ then noted Plaintiff's age as of the alleged onset date (forty-three years old) and his inability to communicate in English.  Id.  Transferability of job skills was immaterial because Plaintiff's past relevant work was unskilled.  Id.

At the fifth step, the ALJ relied upon the VE's testimony in finding that Plaintiff could perform other work that existed in significant numbers in the national economy.  Id. at 32-33.

After considering Plaintiff's age, education, work experience, and RFC, the ALJ determined

Plaintiff could transition to occupations that require only light work, such as (1) assembler of

small products (222,114 jobs nationally); (2) cleaner (housekeeping) (133,482 jobs nationally)[35];

and (3) machine operator (70,323 jobs nationally).  Id. at 33.  The ALJ therefore concluded that

Plaintiff was not disabled from the alleged onset date, December 29, 2009, through the date of

the decision, September 11, 2014.  Id.

## II.   <u>Evaluation of Medical Opinion Evidence</u>

Plaintiff argues that the ALJ erred in evaluating the medical opinion evidence.

Specifically, Plaintiff claims that the ALJ:  (1) improperly considered and rejected the opinion of

Plaintiff's treating physician, Dr. Liu; and (2) improperly afforded relatively greater evidentiary

weight to the opinions of the independent medical examiner, Dr. Lieberman, and the consultative

examiner, Dr. Salon.  ECF # 19 at 13-21; ECF # 24 at 2-8.  The Court addresses each argument

in turn.

### A.   <u>Treating Source Rule</u>

Plaintiff argues the ALJ improperly evaluated the opinion of Plaintiff's treating physician,

Dr. Liu.  ECF # 19 at 13-17; ECF # 24 at 2-6.  The applicable regulations define a treating source

as an "acceptable medical source who provides [], or has provided [the claimant], with medical

treatment or evaluation and who has, or has had, an ongoing treatment relationship with" the

claimant.  20 C.F.R. § 404.1527(a)(2).  A treating source opinion is afforded controlling weight

---

[35] The VE had testified that Plaintiff could not perform the cleaner (housekeeping) job if
he needed to alternate between sitting and standing in addition to the limitations that the ALJ had
hypothesized.  AR at 54.  However, the ALJ did not include this limitation in his RFC
determination.

if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(c)(2).  On the other hand, a treating source opinion is not afforded controlling weight if it is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).  A decision not to afford controlling weight to a treating source's medical opinion must be supported by "good reasons." 20 C.F.R. § 404.1527(c)(2).

First, Plaintiff argues the ALJ's decision was improper because it did not specify the amount of weight afforded to his treating physician's opinion.[36]  ECF # 19 at 15-17; ECF # 24 at 2, 6.  Any error committed by the ALJ may be deemed harmless if it did not affect the outcome of the ALJ's decision.  See Walzer v. Chater, No. 93-CV-6240, 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995) (concluding ALJ's failure to discuss a treating physician's report was harmless error because doing so would not have changed ALJ's decision).  If the ALJ did err by neglecting to explicitly identify the amount of weight he gave to an opinion, such an error may nevertheless be deemed harmless if the ALJ thoroughly considered the opinion.  See, e.g., Brown v. Comm'r of Soc. Sec., 680 F. App'x 822, 824-25 (11th Cir. 2017) (classifying ALJ's failure to specify weight as harmless error because the ALJ considered the relevant opinions in detail); Bus v. Astrue, No. 08-CV-00481-A(M), 2010 WL 1753287, at *5 (W.D.N.Y. Apr. 29, 2010) (finding harmless error where ALJ failed to comment on weight assigned to treating physician's opinion but referenced treating physician's evaluations and treatment notes throughout the decision,

---

[36] Plaintiff similarly argues the ALJ improperly neglected to specify the weight he assigned to the consultative examiner's opinion.  ECF # 19 at 18, 21; ECF # 24 at 6.

indicating that ALJ considered treating physician's reports and opinions); Pease v. Astrue, No. 5:06–CV–0264 (NAM/DEP), 2008 WL 4371779, at *8 (N.D.N.Y. Sept. 17, 2008) (finding ALJ's failure to state specifically the weight afforded a treating physician's opinion was harmless error where ALJ cited the treating physician's records and conclusions throughout the decision).

Here, the ALJ stated that he was "not persuaded" by Dr. Liu's opinion because it was inconsistent with the totality of the medical evidence, thereby implicitly affording it minimal weight.[37]  AR at 31-32.  Remanding the matter for the ALJ to explicitly assign a low degree of weight to Dr. Liu's opinion would not change the ALJ's ultimate determination that Plaintiff was not disabled.  See, e.g., Arguinzoni v. Astrue, No. 08-CV-6356T, 2009 WL 1765252, at *9 (W.D.N.Y. June 22, 2009) (concluding the ALJ's decision would not have changed if he explicitly labeled the weight he afforded to each treating physician's opinion because the ALJ's decision was supported by substantial evidence).  The omission of a specific weight label was therefore harmless error.  See Bus, 2010 WL 1753287, at *5 ("[E]ven if this Court determined the ALJ failed to comment on the weight of [the treating physician's] opinion, this would constitute harmless error, and would not provide a basis for remand to the Commissioner.").[38]

---

[37] The ALJ's explanation of how Dr. Liu's opinion is inconsistent with the totality of the medical evidence is quoted at length herein.  See infra p. 38.

[38] The foregoing analysis and conclusion also address Plaintiff's assertion that the ALJ improperly failed to specify the weight given to the opinion of consultative examiner, Dr. Salon. See, e.g., Lloyd v. Berryhill, 682 F. App'x 491, 497 (7th Cir. 2017) (concluding the ALJ committed harmless error by not explicitly assigning a level of weight to a consultative examiner's opinion because the ALJ thoroughly addressed the consultative examiner's findings); Withus v. Saul, 18-CV-10923 (VSB)(JLC), 2019 WL 6906972, at *15 (S.D.N.Y. Dec. 19, 2019) ("[W]hen an ALJ fails to assign precise weight to the opinion of [a consultative examiner], the error may be harmless when a specific delineation of weight would not change the outcome. Furthermore, an ALJ's decision need not be remanded when the record includes a robust discussion of the opinion of a medical source that allows the reader to infer the weight an ALJ

Second, Plaintiff argues the ALJ failed to give "good reasons" for implicitly giving little weight to Dr. Liu's opinion.  ECF # 19 at 16-17; ECF # 24 at 2-6.  An ALJ must consider several factors when deciding whether to override a treating source's opinion.  Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008)).  These factors include "(1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  Id.; see also 20 C.F.R. § 404.1527(c)(2)(i)-(ii),(c)(3)-(c)(6) (factors to be considered when not giving treating source's medical opinion controlling weight include (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the medical source provides relevant evidence to support a medical opinion; (4) the extent to which the medical opinion is consistent with the record as a whole; (5) whether the medical opinion is given by a specialist; and (6) other factors which may be brought to the attention of the ALJ).  The failure to consider expressly each factor, however, does not amount to legal error per se.  McGovern v. Berryhill, No. 15-CV-10057 (KMK) (PED), 2018 WL 1587154, at *5 (S.D.N.Y. Mar. 29, 2018) (order adopting report and recommendation) (citing Halloran, 362 F.3d at 32).  Remand is unwarranted if, notwithstanding the failure to ruminate expressly on each factor, the ALJ provides "good reasons" for the weight assigned to the opinion, and the ALJ's findings are supported by substantial evidence.  See Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam) (ALJ must comprehensively set forth his or her reasons for not

has given that opinion.") (citations omitted).  Although the ALJ failed to assign a specific weight to Dr. Salon's opinion, this is no more than harmless error, since the ALJ thoroughly discussed Dr. Salon's examination findings, which "showed no significant abnormalities."  AR at 30-31.

giving controlling weight to treating source so as to avoid a basis for remand); Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."); see also Martinez-Paulino v. Astrue, No. 11-CV-5485 (RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2012) ("It is not necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule.") (citing Halloran, 362 F.3d at 32).

Here, the ALJ's decision to find Dr. Liu's assessments unpersuasive is entitled to deference, as it provides good reasons and is supported by substantial evidence.  As the ALJ explained in his decision:

> I am not persuaded by Dr. Liu's assessments in Exhibits 6F and 8F that indicate a residual functional capacity for less than sedentary work as the findings from the MRIs and the physical examinations do not support such a restrictive assessment.  Dr. Liu's opinion is not supported by his own progress notes in Exhibits 5F and 13F which only suggest a left shoulder impingement, and bulges in the lumbar spine and no herniations.  Further, his progress notes do establish the existence of these conditions, yet also revealed that with medication and physical therapy, these conditions improved and his symptoms alleviated.  Nothing in the file, support the environmental limitations assessed by Dr. Liu either.  Dr. Liu's opinion is also inconsistent with Exhibit 3F, an evaluation by orthopedic surgeon, Dr. Liberman [sic], who opined that there was no need for physical therapy and that the degree of disability was mild.

AR at 31-32.  Thus, in evaluating Dr. Liu's opinion, the ALJ considered relevant factors, such as the extent to which Dr. Liu's opinion was consistent (or in this case, inconsistent) with the medical evidence of record, including diagnostic test results, examination findings (including his own progress notes), and prescribed treatments, and explained how Dr. Liu's assessments were not supported by this evidence.

It is well established that "[w]hen a treating physician's opinion is internally inconsistent

or inconsistent with other substantial evidence in the record, the ALJ may give the treating physician's opinion less weight." Illenberg v. Colvin, No. 13-Civ-9016 (AT) (SN), 2014 WL 6969550, at *20 (S.D.N.Y. Dec. 9, 2014) (citing Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)); see Tricarico v. Colvin, 681 F. App'x 98, 101 (2d Cir. 2017) (summary order) ("Although a treating physician's assessment is typically given more weight than other examiners' assessments, internal inconsistencies, and the conflicting opinions of other examining physicians, where supported by evidence in the record, can constitute substantial evidence to support not according the treating physician's opinion controlling weight, as well as good reasons to attribute only limited weight to that opinion."); 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). It is also appropriate to afford less weight to an opinion that is not thoroughly explained or supported by objective medical evidence. See 20 C.F.R. § 404.1527(c)(3) (explaining that the degree of weight given to a medical opinion is affected by the amount of medical evidence and the quality of the explanation supporting the opinion).

In discussing the objective medical evidence in support of his RFC determination and why he was not persuaded by Dr. Liu's assessments, the ALJ described Dr. Liu's and Dr. Patel's treatment records, noting that "[t]he updated treatment notes and physical examinations in Exhibits 12F [Dr. Patel's records] and 13F [Dr. Liu's records] show little wrong with the claimant on recent visits." AR at 31. The ALJ added that "updated evidence from Dr. Hemant Patel show the claimant improving (Exhibit 12F). The latest report dated November 5, 2013 from Dr. Patel indicated no musculoskeletal problems on that day as well as on many prior days." Id. The ALJ also cited the lumbar spine MRI performed in April, 2012, which "showed little abnormalities,"

as well as Dr. Lieberman's assessment (discussed in more detail below), which was consistent with the treatment records.  Id.

In addition, the ALJ rejected Dr. Liu's opinion based on its inconsistency with his own treatment notes, as he was entitled to do.  See Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8 (2d Cir. 2017) (summary order) ("The ALJ did not impermissibly substitute her own expertise or view of the medical proof for the treating physician's opinion.  Rather, the ALJ rejected [the treating physician's] opinion because she found it was contrary to his own treatment notes.") (internal quotation marks, brackets, and citation omitted); Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) ("Because [the treating physician's] medical source statement conflicted with his own treatment notes, the ALJ was not required to afford his opinion controlling weight.").  Dr. Liu's progress notes showed that Plaintiff's conditions improved with medication and physical therapy, AR at 29, 31, and his updated treatment notes showed improvement in Plaintiff's condition and did not reveal any significant problems.  Id. at 30-31.

In sum, the ALJ applied the proper legal standard in evaluating Dr. Liu's opinion, and his decision to decline to assign it controlling weight is supported by substantial evidence.

### B.   Non-Treating Sources

Plaintiff claims the ALJ improperly considered and relied upon the opinions of Dr. Lieberman, an independent medical examiner, and Dr. Salon, a consultative examiner.  ECF # 19 at 17-21; ECF # 24 at 6-8.  The opinions of consultative examiners and independent medical examiners must be evaluated as well.  See 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  As previously discussed, the ALJ considers, among other factors, the degree to which the examiners' opinions are supported by

medical findings and consistent with the record as a whole.  20 C.F.R. §§ 404.1527(c)(3),(4).  It is well settled that the opinions of non-treating sources may constitute substantial evidence in support of an ALJ's rational conclusion.  Suarez v. Colvin, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015); see also Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) (determining the opinions of three non-treating examining physicians, as well as plaintiff's own testimony and medical tests, constituted substantial evidence in support of the ALJ's conclusion).  Furthermore, an ALJ may afford greater weight to the opinions of non-treating examining physicians than to that of a treating physician if the former "are more consistent with the underlying medical evidence." Suarez, 102 F. Supp. 3d at 577; see also Diaz, 59 F.3d at 313 n.5 (opinions of non-examining sources may override treating sources' opinions "provided they are supported by evidence in the record") (citation omitted).

Here, the ALJ assigned "great weight" to Dr. Lieberman's opinion because it was consistent with the progress notes of Plaintiff's treating physicians and because of Dr. Lieberman's specialty as an orthopedic surgeon.[39]  AR at 31; see 20 C.F.R. § 404.1527(c)(5) (generally, more weight is given to the medical opinion of a specialist).  Dr. Lieberman's findings were consistent with Dr. Patel's findings, which repeatedly showed Plaintiff had no musculoskeletal problems.  AR at 30-31.  Additionally, Dr. Lieberman's evaluations showed

---

[39] Contrary to Plaintiff's assertion, ECF # 19 at 19; ECF # 24 at 7-8, the ALJ did not rely on Dr. Lieberman's disability determination, but rather, the ALJ relied on Dr. Lieberman's evaluations and medical opinion, which the ALJ found to be consistent with the progress notes of Plaintiff's treating physicians, as support for the ALJ's own conclusion that Plaintiff was not disabled.  AR at 30-32.  "While it is true that opinions of disability rendered in connection with a workers' compensation claim are not binding on the Commissioner, an ALJ must nonetheless weigh all medical opinions."  Ramsey v. Comm'r of Soc. Sec., 18-CV-0877-MJR, 2020 WL 2781723, at *6 (W.D.N.Y. May 29, 2020) (citation omitted).

good muscle strength and intact sensation in the upper extremities, both of which were consistent with the results of numerous physical examinations conducted by Drs. Liu and Patel.  Id.  Dr. Lieberman's findings were further reinforced by Dr. Salon's examination, which showed no significant abnormalities.  Id.

Plaintiff argues the ALJ erred in "pick[ing] and choos[ing]" portions of the medical evidence that best supported his ultimate RFC conclusion while "rejecting" the portions that undermined his conclusion.  ECF # 19 at 20; ECF # 24 at 7.  The ALJ's RFC conclusion, however, "need not perfectly correspond to any one medical assessment as long as it is supported by the record as a whole."  Tricarico, 681 F. App'x at 101.  Here, the ALJ applied the appropriate legal standard in his consideration of all of the medical evidence in the record, and that evidence, as summarized in detail hereinabove as well as in the ALJ's decision, AR at 29-32, constitutes substantial evidence to support the ALJ's reasonable conclusion regarding Plaintiff's RFC.

## III.   Credibility Determination

Plaintiff disputes whether the ALJ's credibility determination was sufficiently specific to demonstrate that it was supported by substantial evidence.  ECF # 19 at 21-24; ECF # 24 at 8-10.  Specifically, Plaintiff claims the ALJ improperly relied on Plaintiff's statements regarding his ability to perform certain activities of daily living.  Id.

The regulations set forth a two-step process to assess a claimant's credibility.  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).  At the initial step, the ALJ determines whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce [his or her] symptoms, such as pain."  20 C.F.R. § 404.1529(b).  If that is the case, then second, the ALJ considers "the extent to which [the claimant's] symptoms can reasonably be

accepted as consistent with the objective medical evidence and other evidence" of record.  20

C.F.R. § 404.1529(a).  However, the ALJ "is not required to accept the claimant's subjective

complaints without question; he [or she] may exercise discretion in weighing the credibility of

the claimant's testimony in light of the other evidence in the record."  Genier, 606 F.3d at 49

(citation omitted).  When rejecting subjective complaints, an ALJ "must do so explicitly and with

sufficient specificity to enable the Court to decide whether there are legitimate reasons for the

ALJ's disbelief and whether his [or her] determination is supported by substantial evidence."

Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987).

The ALJ must consider all available evidence, including objective medical evidence and

information regarding (i) the claimant's daily activities; (ii) the location, duration, frequency, and

intensity of his or her symptoms; (iii) any precipitating and aggravating factors; (iv) the type,

dosage, effectiveness, and side effects of any medications taken; (v) treatment other than

medication used to relieve the claimant's symptoms; (vi) any measures used to relieve his or her

symptoms; and (vii) other factors concerning functional limitations and restrictions resulting

from the claimed symptoms when evaluating a claimant's credibility.  20 C.F.R. §

404.1529(c)(3)(i)-(vii); SSR 96-7p, 1996 WL 374186, at *3 (S.S.A. 1996).[40]  The ALJ is not

required to "discuss all the factors, however, as long as the decision includes precise reasoning,

is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the

claimant's statements and the reasoning for that weight."  Simmons v. Comm'r of Soc. Sec., 103

F. Supp. 3d 547, 569 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).

---

[40] SSR 96-7p was superseded by SSR 16-3p, 2016 WL 1119029 (S.S.A. 2016), effective
March 16, 2016.

"It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." Cichocki, 534 F. App'x at 75 (quoting Carroll v. Sec'y of Health & Human Servs., 795 F.2d 638, 642 (2d Cir. 1983)). "While it is not sufficient for the [ALJ] to make a single, conclusory statement that the claimant is not credible or simply to recite the relevant factors, remand is not required where the evidence of record permits us to glean the rationale of an ALJ's decision[.]" Id. at 76 (internal quotation marks and citations omitted). Where an ALJ provides specific reasons for finding a claimant's testimony not credible, the ALJ's credibility determination "is generally entitled to deference on appeal." Selian, 708 F.3d at 420 (citations omitted); see Tejada, 167 F.3d at 775-76 (upholding ALJ's credibility determination, citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985), in which the district court noted "that after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment."). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Aponte v. Sec., Dep't of Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

Here, the ALJ acknowledged that Plaintiff's impairments could cause the alleged symptoms, but concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible for the reasons explained in this decision." AR at 28. The ALJ noted that the "medical evidence shows the claimant has a back and shoulder impairment which causes work related functional limitations but the evidence does

not show his impairments would be severe enough to prevent him from performing all work activity." Id. at 29.  The ALJ then proceeded through a detailed consideration and analysis of the objective medical evidence in the record, which showed overall improvement in Plaintiff's condition over time.  Id. at 29-31.  Although the ALJ did not expressly consider each factor listed in the regulations, he addressed those that were relevant to Plaintiff's claim.  Thus, the ALJ noted the alleviative effects of medication and physical therapy, as reflected in Plaintiff's progress notes.  Id. at 31; see 20 C.F.R. §§ 404.1529(c)(3)(iv),(v) (SSA considers medication taken and other treatment received in evaluating credibility).  He also cited Plaintiff's testimony as to his ability to perform numerous activities of daily living, such as grocery shopping, cooking, cleaning his apartment, reading, watching television, and taking public transportation by himself, which provided further support for the ALJ's conclusion that Plaintiff was not precluded from all work activity.  Id. at 32; see 20 C.F.R. § 404.1529(c)(3)(i) (SSA considers evidence of claimant's daily activities in evaluating credibility).

Accordingly, the Court finds no error in the ALJ's credibility analysis, as it was supported by substantial evidence, relied upon the relevant factors, and was set forth with "sufficient specificity to permit intelligible plenary review of the record."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citation omitted); see Cichocki, 534 F. App'x at 76 ("Because the ALJ thoroughly explained his credibility determination and the record evidence permits us to glean the rationale of the ALJ's decision, the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand.").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (ECF # 18) is

DENIED, and the Commissioner's motion for judgment on the pleadings (ECF # 21) is

GRANTED.  The Clerk of the Court is directed to close the case.

Dated: July 27, 2020
       White Plains, New York

                                         **SO ORDERED**,

                                         _____
                                         Lisa Margaret Smith
                                         United States Magistrate Judge
                                         Southern District of New York